IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ESTATE OF NANCY MURRAY,          :     CIVIL ACTION
et al.                           :
                                 :
          v.                     :
                                 :
UHS OF FAIRMOUNT, INC. d/b/a     :
FAIRMOUNT BEHAVIORAL HEALTH      :
SYSTEM                           :     NO. 10-2561

MEMORANDUM

McLaughlin, J.                              November 9, 2011

          This lawsuit arises from the termination of Nancy
Murray's employment as a staff nurse for the defendant, UHS of
Fairmount ("UHS").[1]  Following her termination in May 2009,
Murray filed a complaint against her former employer, asserting
violations of the Family Medical Leave Act ("FMLA") and the
Americans with Disabilities Act ("ADA").  Murray claimed that her
termination was either an interference with or a retaliation for
her exercise of rights under the FMLA.[2]  She also claimed actual
and perceived disability discrimination and unlawful retaliation
in violation of the ADA.

_____

          [1] Nancy Murray passed away on June 13, 2011.  Her estate
(administered by her sister, Kathleen Bradley) is now the
plaintiff in the case.

          [2] The plaintiff withdrew an FMLA interference claim in her
response to the defendant's motion for summary judgment.  Pl.'s
Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") 3 n.2.

The defendant, UHS, moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  The Court will grant the defendant's motion.

I.   <u>Factual Background</u>

The facts presented here are undisputed unless otherwise noted.  Disputed facts are read in the light most favorable to the plaintiff, the nonmoving party.  <u>See</u> <u>Sheridan v.</u> <u>NGK Metals Corp.</u>, 609 F.3d 239, 251 n.12 (3d Cir. 2010).

A.   Nancy Murray's Mental Health Issues and Leaves of <u>Absence</u>

Nancy Murray worked as a staff nurse in the mental health unit at UHS's Fairmount Hospital from June 25, 2007 until her termination on May 15, 2009.  Def.'s Stmt. of Undisputed Facts ("Def.'s Stmt.") ¶¶ 1, 20; Pl.'s Resp. to Def.'s Stmt. of Undisputed Facts ("Pl.'s Stmt. Resp.") ¶¶ 1, 20; Def.'s Mot. for Summ. J. ("MSJ"), Murray Dep. 153-54, Ex. A ("Murray Dep.").  Her boyfriend, Ira Newman, also worked at UHS until March 2009.  Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp."), Newman Dep. 104, Ex. E ("Newman Dep.").

Murray began suffering from depression in 2003.  Her mental health issues subsided briefly in 2007 when Murray procured employment at UHS.  At some point, although the record is unclear on when, Murray began suffering from depression again.

As a result, Murray was forced to take leave from work.  See Murray Dep. 8, 10, 26, 27, 148, 150-51.

Murray took two leaves of absence from UHS: the first from December 24, 2008 to January 7, 2009, and the second from April 27, 2009 to May 4, 2009.  She took these leaves because of her depression.  Murray supplied a doctor's note upon returning from leave, but the doctor's note did not specify that mental illness was the reason for her absence.  Murray Dep. 148;  Pl.'s Opp., Ex. C (Note from Dr. Gary Cohen).

### B.   UHS's Awareness of Murray's Mental Health Issues

After returning from leave, Murray told the charge nurse, Beth Ann Watson, in confidence that her anxiety and depression necessitated the absence.[3]  Pl.'s Opp., Watson Dep. 56-57, Ex. D ("Watson Dep."); Murray Dep. 145.  Beth Ann Watson forwarded Murray's doctor's note to the UHS human resources ("HR") department, but testified that she did not discuss Murray's mental condition with anyone else at UHS.  Watson Dep. 57-60.

---

[3] The record is not clear regarding whether Murray told Watson after returning from her first leave in January 2009 or after her second in May 2009.  Compare Murray Dep. 145 (testifying that she told Watson after the first leave) with Murray Dep. 151 (after the second).  The Court expresses no view on when the disclosure occurred, as the only material fact for the purposes of this motion is that Murray disclosed her depression to Watson.

Theresa Mahoney, the HR director, was aware of Murray's medical absences in late 2008 and in 2009.  However, she testified that she did not recall the reasons for the absences. In addition, Theresa Mahoney was not aware that Murray had any medical issues other than an infection and a dental issue; no one had ever told her Murray was suffering from anxiety or depression.  MSJ, Mahoney Dep. 13-14, Ex. B ("Mahoney Dep.").

A few weeks before Ira Newman left UHS in March 2009, Jack Plotkin, the Chief Nursing Officer and Watson's supervisor, pulled Newman into his office to inquire about Murray's mental health issues.[4]  In particular, Plotkin asked Newman how Murray was feeling and what medications she was taking.  Newman Dep. 104-06.  Murray herself also received inquiries about her mental health from both Beth Ann Watson and Jack Plotkin when she returned to work after her second leave of absence in May 2009. Jack Plotkin asked Murray how she was doing several times between her return to work on May 4, 2009 and her termination from UHS on May 15, 2009.  Murray Dep. 164, 166, 170.

---

[4] The parties dispute whether this conversation between Jack Plotkin and Ira Newman ever took place.  Compare Newman Dep. 63-64, 104-06 (describing the conversation) with Plotkin Dep. 117 (Plotkin testifies that he does not recall speaking to Newman about Murray in any form or facet).  Indeed, Jack Plotkin testified that he was not aware of any medical issues with Murray.  Plotkin Dep. 114-15.  The Court draws factual inferences in favor of Murray.

C.   UHS Narcotics Distribution and Administration Procedure

UHS has specific guidelines regarding the distribution of narcotics.  Before being put in a position to distribute narcotics, UHS employees receive training regarding the distribution, accounting, and storage of narcotics.  Def.'s Stmt. ¶¶ 2, 5; Pl.'s Stmt. Resp. ¶¶ 2, 5.

The UHS pharmacy delivers medication when needed to a locked med room near the nurse's station for which only a nurse has the key.  Murray Dep. 111-12; Watson Dep. 20-21.  UHS tracks narcotics distribution via two documents: (1) the Pharmacy Controlled Drug Unit Supply Record (the "Pharmacy Record") and (2) the Schedule II Controlled Substance sheet (the "Schedule II").  First, the nurse that receives narcotics from the pharmacy counts and signs for the amount received on the Pharmacy Record. Second, that same nurse enters the corresponding amount received from the pharmacy on the Schedule II, which is also kept in the locked med room.  See Murray Dep. 111-12; Watson Dep. 20-21.

The medication administration record ("MAR") contains the doctor's orders regarding how much medication each patient on the unit is supposed to receive, and when.  Every administration of narcotics to a patient is recorded on the Schedule II to keep a constant count of how many narcotics are in the medication drawer.  See Murray Dep. 89; Plotkin Dep. 76; Def.'s Stmt. ¶¶ 6-10; Pl.'s Stmt. Resp. ¶¶ 6-10.

Occasionally, nurses have to "waste," or dispose of narcotic medications – for example, if a patient refuses to take them or a nurse pours out too many pills.  UHS's wasting procedure requires that another nurse "witness" the disposal of the drugs - usually down the sink drain.  The witness must then sign the Schedule II to confirm the waste.  Def.'s Stmt. ¶ 11; Pl.'s Stmt. Resp. ¶ 11.

At the end of every shift, the leaving and oncoming nurse count the narcotics in the medication drawer to make sure there are no discrepancies between the count and the amount listed on the Schedule II.  If there is a discrepancy in the narcotics count, the nurses must call the nursing management or supervisor about the problem.  Def.'s Stmt. ¶ 10, 12; Pl.'s Stmt. Resp. ¶¶ 10, 12.

D.   <u>The May 14, 2009 Narcotics Mistakes</u>

The record reflects that Nancy Murray made two narcotics-related mistakes on May 14, 2009, shortly after she returned from her second leave of absence: (1) Murray did not secure a witness's signature for narcotics that she wasted; and (2) Murray mistakenly signed for 25 doses of Adderall from the pharmacy when only 23 doses were provided.  Although the first error occurred before the second, the Court recites the facts here in reverse.

6

1.   Discrepancy Between the Pharmacy Record and the
     Schedule II

On May 14, 2009, the Schedule II reflected that the
medication cart contained five 10 mg pills of Adderall at the
beginning of the Nancy Murray's 7:00 a.m. shift.  That day,
Murray signed out two 20 mg doses (4 pills total) of Adderall for
a patient named "A.M." and one 10 mg dose (1 pill) of Adderall
for a different patient.  With the Adderall count down to zero,
Murray ordered more Adderall from the pharmacy.  Pl.'s Opp., Ex.
G (Schedule II); Murray Dep. 122.

When the pharmacy technician arrived, Murray signed the
Pharmacy Record, mistakenly acknowledging that 25 doses (10 mg)
of Adderall were provided to her.  In fact, the pharmacy provided
only 23 doses to Murray.[5]  When she signed the Adderall into the
Schedule II, Murray recorded only 23 doses (10 mg) of Adderall.
Def.'s Stmt. ¶¶ 13-15; Pl's Stmt. Resp. ¶¶ 13-15; Murray Dep.
122-23.


2.   Lack of a Wasting Signature

According to Murray, patient "A.M." refused to take
some of her Adderall on May 14, 2009.  Another nurse, Elizabeth
Rody, watched Murray waste some Adderall down the sink.[6]

_____

[5] UHS has not supplied evidence to the contrary.

[6] This fact is disputed.  Elizabeth Rody testified that she
did not recall witnessing Murray waste medication on May 14,

7

However, Nurse Rody was called away on a psychological emergency before she could sign the Schedule II as a witness to wasting, as required by UHS narcotics procedures.  Although Murray admitted that she should have done so, Murray did not otherwise indicate on the Schedule II that any of the Adderall she signed out for "A.M." had been wasted.  After Murray's shift, the oncoming nurse, Debbie Stabler, signed off on the Schedule II despite the absence of a wasting signature.  Murray Dep. 126-27, 131-36.

Murray did not report to her supervisors either the mistake she made in signing out 25 doses of Adderall from the pharmacy or her inability to secure a witness's signature for wasted medication.  Murray Dep. 135-36; Def.'s Stmt. ¶¶ 17-18; Pl.'s Stmt. Resp. ¶¶ 17-18.

   E.   Investigation of the Narcotics Mistakes and Murray's
        Termination on May 15, 2009

The following day, a different nurse on the unit contacted Jack Plotkin, the Chief Nursing Officer, with concerns about the administration of medication to patient "A.M." on May

---

2009.  MSJ, Rody Dep. 41-46, Ex. D ("Rody Dep.").  Furthermore, the record is unclear as to exactly how many Adderall pills were wasted on Murray's shift.  Murray initially testified that "20 milligrams of Adderall and the 10 milligrams of Adderall" – which the Court understands to be three 10 mg pills - were wasted. Murray Dep. 133.  Later, however, she testified that she threw two Adderall down the sink.  Id. at 134.  Because the number of pills wasted is not material, for the purposes of deciding the motion, the Court accepts as true that some number of Adderall pills were wasted.

14, 2009.  The nurse informed Plotkin that she could not find a doctor's order that justified the amount of Adderall administered to patient "A.M." the day before, as indicated on the Schedule II.  Plotkin Dep. 74-76.

Plotkin investigated by examining the Schedule II as well as the medication administration record ("MAR") for patient "A.M."  Plotkin understood the MAR to order one 10 mg dose of Adderall for "A.M." at 9:00 a.m. on May 14, 2009.[7]  After bringing the issue to the attention of Theresa Mahoney in the HR department, Plotkin probed further and noticed the discrepancy between the 25 doses of Adderall signed out from the Pharmacy Record by Murray and the 23 doses signed into the Schedule II. Plotkin Dep. 75-77; Mahoney Dep. 33-34.

Plotkin also spoke to Nurse Elizabeth Rody as part of his investigation.  In that conversation, Rody told Plotkin that she did not recall witnessing Nancy Murray waste medication on

_____

[7] There is no admissible evidence in the summary judgment record - and the Court expresses no view - regarding the actual Adderall prescription for patient "A.M." on May 14, 2009.  The MAR for patient "A.M." is not part of the record.  The facts set forth here reflect only Jack Plotkin's understanding.

The plaintiff denies that the dosage prescribed to "A.M." was one 10 mg dose.  Citing Nancy Murray's deposition testimony, the plaintiff argues that the dosage was two 10 mg pills, or 20 mg.  See Pl.'s Stmt. Resp. ¶ 16; Tr. of Oral Arg., 29-30, Sept. 22, 2011.  However, the cited testimony from Murray refers to the dosage recorded on the Schedule II, not the prescribed dosage on the patient's MAR.  See Murray Dep. 117.  Therefore, the Court need not accept counsel's characterization of Murray's testimony as true.

May 14, 2009.  After Plotkin spoke with Rody, he and Theresa
Mahoney decided to terminate Murray's employment with UHS.
Plotkin Dep. 78-79.

It is disputed whether Murray was asked for an
explanation for her narcotics mistakes on May 14, 2009, but
according to Murray, she was never given a chance to explain what
happened.[8]  Pl.'s Stmt. Resp. ¶ 19.  Murray was terminated on May
15, 2009, eleven days after returning from her second leave of
absence.

II.  Analysis

A.  Legal Standard

Summary judgment is appropriate if there is "no genuine
dispute as to any material fact and the movant is entitled to

---

[8] According to Jack Plotkin, he and Theresa Mahoney decided
that Plotkin should call Murray to ask for an explanation.
During that first call to Murray, Murray explained that she
poured the wrong amount of drugs and asked another nurse to
witness the wasting.  Plotkin then spoke to Nurse Elizabeth Rody,
who denied doing so.  Plotkin and Mahoney then discussed the fact
that there was no good explanation for the missing medications
from the pharmacy and the discrepancies in the paperwork and
decided to terminate Murray's employment.  Only then, according
to Plotkin, did he call Murray to inform her of her termination.
See Plotkin Dep. 78-81.
By contrast, Murray testified that Plotkin only called her
once and never gave her a chance to explain the discrepancy.
Murray Dep. 45.  Ira Newman confirmed Murray's version of events.
Newman Dep. 59-60.  The Court accepts Murray's facts as true, as
it must, although the Court notes that Murray and Newman neither
contest that Plotkin's conversation with Rody occurred nor
explain how Plotkin knew to talk to Rody.

judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of informing the court of the basis for its motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The party may meet that burden by showing that the party who bears the burden of proof lacks sufficient evidence to support his case.  See id.  Once a party files a properly supported motion for summary judgment, the burden shifts to the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial.  Anderson v. Liberty v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

A fact is "material" if it might affect the outcome of the suit under the governing law.  Id. at 248.  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most favorable to the nonmoving party.  See Sheridan v. NGK Metals Corp., 609 F.3d 239, 251 n.12 (3d Cir. 2010).


B.   Legal Framework

Where there is no direct evidence of discrimination, the Third Circuit analyzes ADA disparate treatment and retaliation claims and FMLA claims under the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See Shaner v. Synthes, 204 F.3d 494, 500 (3d

Cir. 2000); <u>Parker v. Verizon Pa. Inc.</u>, 309 F. App'x 551, 555 (3d Cir. 2009).[9]  Under that framework, the plaintiff must first establish a prima facie case of discrimination.  If the plaintiff succeeds in doing so, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>McDonnell Douglas</u>, 411 U.S. at 802.  Finally, if the defendant carries its burden, the plaintiff must have the opportunity to prove that the reasons offered by the defendant were not its true reasons, but rather a pretext for discrimination.  <u>Shaner</u>, 204 F.3d at 500.

C.   <u>Prima Facie Case: ADA Claims</u>

The ADA makes it unlawful for an employer to discriminate against an employee on the basis of her disability. 42 U.S.C. § 12112(a).  On behalf of Nancy Murray, the plaintiff brings actual and perceived disability discrimination as well as retaliation claims under the ADA.

---

[9] The Third Circuit has explicitly held that the <u>McDonnell Douglas</u> framework applies to FMLA retaliation claims only in unpublished opinions.  <u>See, e.g.</u>, <u>Parker v. Verizon Pa., Inc.</u>, 309 F. App'x 551, 555 (3d Cir. 2009).  However, district courts in this circuit have uniformly applied the <u>McDonnell Douglas</u> framework to FMLA claims.  <u>See, e.g.</u>, <u>Alred v. Eli Lilly & Co.</u>, 771 F. Supp. 2d 356, 370 (D. Del. 2011); <u>Michniewicz v. Metasource, LLC</u>, 756 F. Supp. 2d 657, 668 (E.D. Pa. 2010); <u>Parker v. Hanhemann Univ. Hosp.</u>, 234 F. Supp. 2d 478, 488 (D.N.J. 2002); <u>Wilson v. Lemington Home for the Aged</u>, 159 F. Supp. 2d. 186, 194-95 (W.D. Pa. 2001).

1.  <u>Disability Discrimination</u>

In order to make out a prima facie case of discrimination under the ADA, the plaintiff must establish that Murray (1) has a disability, (2) is a qualified individual, and (3) has suffered an adverse employment action because of that disability.  <u>Turner v. Hershey Chocolate U.S.</u>, 440 F.3d 604, 611 (3d Cir. 2006).  Here, UHS disputes only that Murray has a disability as defined by the ADA.

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1).  As a preliminary matter, the ADA Amendments Act of 2008 ("ADAAA" or the "Act") made it easier for plaintiffs to prove that they are "disabled" within the meaning of the ADA.[10] Section 2(b)(5) of the Act provides that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  Similarly, section 4(a) of the Act provides that the definition of "disability" under the ADA "shall be construed in favor of broad coverage of individuals."

_____

[10] The amendments took effect on January 1, 2009, and are thus applicable to the conduct in this case.  <u>See</u> ADA Amendments Act of 2008, Pub. L. No. 110-325, § 8, 122 Stat. 3553, 3559 (2008); <u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495, 501 n.5 (3d Cir. 2010).

ADAAA § 4(a) (codified at 42 U.S.C. § 12102(4)(A)).[11]  In doing

so, the ADAAA specifically overrules the Supreme Court's

definition of "substantially limit" as requiring significant

restriction compared to the general population.  See id. §

2(b)(4)-(5) (superseding Toyota Motor Mfg. v. Williams, 534 U.S.

184, 198 (2002)).

Murray raises claims of actual disability as well as

"regarded as" or perceived disability.  The Court addresses these

claims in order.

> a.   Actual Disability: Impairment That
>      Substantially Limits One of More Major Life
>      Activities

UHS does not dispute that depression qualifies as an

impairment under the ADA.[12]  Rather, UHS makes three arguments:

(1) first, UHS challenges the sufficiency of the plaintiff's

evidence of depression; (2) second, UHS argues that the plaintiff

has not demonstrated impairment of a "major life activity"; (3)

third, UHS challenges whether any such impairment has been

"substantial."

---

[11] The EEOC's regulations reflect these changes from the
ADAAA.  See 29 C.F.R. § 1630.2(j).

[12] The Third Circuit has stated that depression qualifies as
an impairment only in unpublished opinions.  See, e.g., Szczesny
v. Gen. Elec. Co., 66 F. App'x 388, 393 (3d Cir. 2003); see also
Wilson v. Lemington Home for the Aged, 159 F. Supp. 2d 186, 198
(W.D. Pa. 2001) ("Depression may qualify as impairments for
purposes of the ADA.").

(1)   <u>Medical Evidence of Depression</u>

UHS complains that the plaintiff has not submitted medical evidence of Nancy Murray's depression.  Def.'s Reply 1.

Murray testified in her deposition that she suffered from anxiety and depression and received a diagnosis from a doctor regarding the same.  Murray Dep. 214.  UHS has not offered evidence to the contrary, medical or otherwise.  Nor has UHS cited any case law that requires <u>medical</u> evidence of an impairment.  Indeed, the Third Circuit has stated that "the necessity of medical testimony turns on the extent to which the alleged impairment is within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge."[13]  <u>Marinelli v. City of Erie</u>, 216 F.3d 354, 360 (3d Cir. 2000).  <u>See also</u> <u>Katz v. City Metal Co., Inc.</u>, 87 F.3d 26, 32 (1st Cir. 1996) ("There is certainly no general rule that medical testimony is always necessary to establish disability.")

In <u>Marinelli</u>, the Third Circuit found that arm and back pain were not technical in nature and were thus amenable to comprehension by a lay jury.  Thus, the court found that the plaintiff's failure to present medical evidence did not warrant judgment as a matter of law in favor of the defendant.

---

[13] The Court notes that <u>Marinelli</u> was a pre-ADAAA case.  As outlined above, the ADAAA provides that the question of disability should not require extensive analysis.  <u>See</u> <u>supra</u>.

_Marinelli_, 216 F.3d at 361.  Similarly, here, depression is also amenable to comprehension by a lay jury.  A reasonable jury could conclude on the basis of Murray's deposition testimony that she was, in fact, depressed.  Thus, the plaintiff's failure to produce medical evidence regarding Murray's depression is not, by itself, fatal to her claim.

### (2)  "Major Life Activity"

Being diagnosed with depression, by itself, does not make an employee "disabled" under the ADA: the plaintiff must show with medical evidence that the depression substantially limits a major life activity.  See _Toyota Motor Mfg. v. Williams_, 534 U.S. 184, 198 (2002), _superseded by statute on other grounds_, ADAAA, Pub.L. 110-325, 122 Stat. 353 (2008).  Here, UHS argues that Murray has not identified any major life activities impaired by her depression.

The record reflects otherwise.  Murray testified in her deposition that she experienced symptoms such as "[n]ot eating, not sleeping, having racing thoughts . . . [and] just feeling hopeless, helpless, sad."  Murray Dep. 214.  UHS has not offered evidence to the contrary.  Thinking, eating, and sleeping are specifically listed in the ADA as major life activities.  42 U.S.C. § 12102(2)(A).

16

        (3)   Sufficiency of Evidence That the
              Limitation Is "Substantial"

     Finally, UHS argues that the plaintiff has adduced no

evidence of substantial limitation on Murray's major life

activities.[14]  UHS makes both a temporal argument and a challenge

to the sufficiency of the evidence presented.

     UHS first makes a temporal argument that transitory,

temporary, or impermanent impairments do not "substantially

limit" as a legal matter.  UHS is correct that prior to the

ADAAA, among the factors the Third Circuit examined to determine

whether a plaintiff was substantially limited were: (1) the

nature and severity of the impairment; (2) the duration or

expected duration of the impairment; and (3) the permanent or

long term impact, or the expected permanent or long term impact

of or resulting from the impairment.  Emory v. AstraZeneca

Pharms. LP, 401 F.3d 174, 179-80 (3d Cir. 2005).

     However, since the passage of the ADAAA, the EEOC has

adopted regulations interpreting the statute.  The EEOC

regulations provide that "effects of an impairment lasting or

expected to last fewer than six months can be substantially

limiting."  29 C.F.R. § 1630.2(j)(1)(ix).[15]  Furthermore, "[a]n

---

     [14] Generally, the question of whether the plaintiff is
substantially limited in performing a major life activity is a
question of fact.  Williams v. Phila. Housing Auth. Police Dept.,
380 F.3d 751, 763 (3d Cir. 2004).

     [15] In a pre-ADAAA case, the Third Circuit found that EEOC
regulations interpreting the ADA were entitled to Chevron

impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." Id. § 1630.2(j)(1)(vii).  The post-ADAAA EEOC regulations also caution that "substantially limits" is "not meant to be a demanding standard" and shall be construed broadly in favor of expansive coverage, to the "maximum extent permitted by the ADA." 29 C.F.R. § 1630.2(j), (k).  These updated regulations bring into question the continuing vitality of the "permanent or long term impact" factor laid out by the Third Circuit in Emory.[16]

In this case, Murray testified that she has suffered from depression and anxiety since 2003.  She also testified that in 2007, when she applied and got a job at UHS, she was happy and not suffering from the illnesses.  Murray Dep. 26-27.  The record is unclear about when Murray's illness returned, but Murray testified that her leaves of absences in 2008 and 2009 were due to her depression and anxiety.  Id. at 148.  Murray also

---

deference.  Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 515 n.8 (3d Cir. 2001).  The Court sees no reason why that holding would change post-ADAAA given that the Act specifically gives the EEOC authority to issue regulations to implement the Act's definitions of disability.  See ADAAA § 6(a)(2) (codified at 42 U.S.C. § 12205a).

[16] The Court is aware of only one case in this circuit that has addressed the new EEOC regulation regarding impairments lasting less than six months.  Cohen v. CHLN, Inc., No. 10-514, 2011 WL 2713737 (E.D. Pa. July 13, 2011).  In Cohen, Judge Buckwalter found that the plaintiff's testimony regarding debilitating back and leg pain for nearly four months before his termination raised a genuine issue of material fact as to whether he was disabled at the time of his termination.  Id. at *7-8.

testified that she was taking three medications to treat her depression.  Id. at 8-10, 16.

Although the record in this case is sparse, there is evidence to support the inference that Murray's depression has been of significant duration and chronic in nature, even if it has occasionally subsided.  In light of the purpose of the ADAAA and the EEOC regulations interpreting the statute, the Court agrees with the plaintiff that the nature of Murray's depression, by itself, does not preclude a finding that her depression "substantially limits" major life activities.

Next, UHS generally argues that Murray has not proffered sufficient evidence of substantial limitation.  Here, the only evidence that Murray has produced to show that her depression has limited her eating, sleeping, and thinking is her deposition testimony that she experienced symptoms such as "[n]ot eating, not sleeping, having racing thoughts . . . [and] just feeling hopeless, helpless, sad."  Murray Dep. 214.  She did not testify as to the severity, duration, or frequency of these symptoms and has submitted no other evidence to indicate that the impact on these major life activities has been substantial.

Under pre-ADAAA case law, Murray's evidence would almost certainly have failed to demonstrate substantial limitation.  But post-ADAAA, the result is more uncertain given

the statute's command that "substantially limits" is not meant to
be a demanding standard.

The post-ADAAA EEOC regulations provide some guidance,
but do not clearly dictate a result.  On the one hand, the
regulations provide that an impairment "need not prevent, or
significantly or severely restrict, the individual from
performing a major life activity in order to be considered
substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  The
inquiry into substantial limitation "should not demand extensive
analysis."  Id. § 1630.2(j)(1)(iii).  Furthermore, section
(j)(3)(iii) specifically states that "it should easily be
concluded" that "major depressive order . . . substantially
limit[s] brain function."[17]

Nevertheless, the regulations also caution that "not
every impairment will constitute a disability within the meaning
of [the ADA]," so a line must be drawn somewhere.  Id. §
1630.2(j)(1)(ii).  In addition, an impairment is a disability
within the meaning of the ADA only if it substantially limits the
ability of an individual to perform a major life activity "as
compared to most people in the general population."  29 C.F.R. §
1630.2(j)(1)(ii) (emphasis added).  Although the comparison of an
individual's performance of a major life activity "usually will

---

[17] Nothing in the record suggests an answer as to whether
Murray's depression is equivalent to "major depressive order."
The Court expresses no view on the question.

20

not require scientific, medical, or statistical analysis," Murray has not produced a modicum of evidence in this case that would allow the Court to even engage in a comparison of her symptoms with those of others.  Id. § 1630.2(j)(1)(v).

There is also relatively little case law applying the more relaxed post-ADAAA standard for substantial limitation.  The Court is aware of one case directly on point.  See Naber v. Dover Healthcare Assoc., Inc., 765 F. Supp. 2d 622 (D. Del. 2011).  In Naber, the court noted that the ADAAA did not relieve the plaintiff of her burden to prove that her impairment substantially limits her ability to sleep.  Id. at 646.  The court found that there was a question of fact as to whether the plaintiff's depression was the cause of her inability to sleep and whether the sleeplessness was substantially limiting as compared to the average person in the general population.  Id. at 646-47.  Thus, the court stated that it could not grant summary judgment for failure to set forth a prima facie case (but granted summary judgment on other grounds).  Id.

The record in this case is less robust than that in Naber.  In Naber, the plaintiff testified that prior to her termination, she was unable to sleep at all one or two nights a week because of her depression, and that the condition had persisted through the time of her deposition.  Id. at 646.  Thus, the Naber court had a few data points with which it could draw

21

comparisons to the general population.  By contrast, Murray's evidence boils down to a brief mention in her deposition of not eating, not sleeping, and having racing thoughts without any details as to duration, frequency, or severity.

The Court recognizes that the record as to whether Murray's depression substantially limits her major life activities is incredibly sparse.  Nevertheless, given the stated intent of the ADAAA, the statute's command to construe "disability" broadly, and the dearth of post-ADAAA case law opining on the issue, the Court declines to grant summary judgment on the basis of failing to make out a prima facie case of "disability" under the ADA.  Rather, the Court grants summary judgment because the plaintiff has failed to raise a genuine issue of material fact regarding pretext, as discussed below. See infra.

### b.   Perceived Disability

"Regarded as" disability does not depend on the plaintiff having any impairment.  The question is not the plaintiff's actual condition, but rather her condition as perceived by her employer, including the "reactions and perceptions of the persons interacting or working with [her]." Kelly v. Drexel Univ., 94 F.3d 102, 108 (3d Cir. 1996).

The ADAAA clarified two points about "regarded as" disability.  First, a plaintiff meets the requirement of being "regarded as" disabled if she establishes discrimination "because of an actual or perceived physical or mental impairment <u>whether or not the impairment limits or is perceived to limit a major life activity</u>."[18]  ADAAA § 4(a) (codified at 42 U.S.C. § 12102(3)(A)) (emphasis added).  Second, a plaintiff cannot be "regarded as" disabled if the actual or perceived impairment is "transitory and minor," which is defined as one "with an actual or expected duration of 6 months or less."  <u>Id</u>. (codified at 42 U.S.C. § 12102(3)(B)).

The record in this case shows that Beth Ann Watson, the charge nurse who supervises Murray, knew that Murray suffered from depression and anxiety.  Construed in the light most favorable to the plaintiff, the facts as set forth above also show that Jack Plotkin, the Chief Nursing Officer, was aware of Murray's mental health issues.  As discussed previously, the record is spotty on the issue of duration, but there is at least some evidence to support a jury finding that Murray's depression was chronic and recurring and, hence, not transitory.  Because the ADAAA no longer requires a showing that Murray's impairment

---

[18] The defendant cites <u>Sulima v. Tobyhanna Army Depot</u>, 602 F.3d 177 (3d Cir. 2010) in its reply for the proposition that the employer must believe that the condition impairs major life activity.  Def.'s Reply 2.  However, <u>Sulima</u> applies pre-ADAAA law.

was perceived to substantially limit a life activity, the
plaintiff has raised a genuine issue of material fact as to
whether Murray was regarded as disabled by UHS under the ADAAA.

Nevertheless, as discussed below, the Court grants
summary judgment on other grounds.

2.   Retaliation for Requesting an Accommodation under
     the ADA

In order to establish a prima facie case of illegal
retaliation under the ADA, a plaintiff must show (1) protected
employee activity; (2) adverse action by the employer either
after or contemporaneous with the employee's protected activity;
and (3) a causal connection between the employee's protected
activity and the employer's adverse action.  Williams v. Phila.
Housing Auth. Police Dept., 380 F.3d 751, 759 (3d Cir. 2004).
Unlike a claim for discrimination, an ADA retaliation claim does
not require that the plaintiff show that she is "disabled" as
defined by the ADA.  Shellenberger v. Summit Bancorp, Inc., 318
F.3d 183, 188 (3d Cir. 2003).  A plaintiff alleging retaliation
need only show that she had a "reasonable, good faith belief that
she was entitled to request the reasonable accommodation she
requested."  Williams, 380 F.3d at 759 n.2.

Murray argues that she requested accommodation for her
depression in the form of two leaves of absence from work, and
that UHS retaliated by firing her.  UHS argues that Murray did

24

not request an accommodation and that, in any case, UHS allowed Murray to be absent from work.  UHS's counter is neither here nor there, however, as it does not address Murray's claim that she was terminated for taking her leaves of absence.

D.   <u>Prima Facie Case: FMLA Claim for Retaliation</u>

To establish a prima facie case for retaliation under the FMLA, the plaintiff must demonstrate that (1) Murray invoked her right to FMLA benefits, (2) she suffered an adverse employment action, and (3) the adverse action was causally related to the invocation of her rights.  Erdman v. Nationwide Ins. Co., 82 F.3d 500, 508-09 (3d Cir. 2009).  UHS's objections to Murray's FMLA claims are vague, but appear to challenge only the third element - causation.[19]  UHS argues that the plaintiff only supports her claim of causation with temporal proximity. <u>See</u> Def.'s Reply 6.  The Court finds no issue with the causation of the plaintiff's prima facie case.

The plaintiff notes that only eleven days passed between Murray's return from her second leave of absence and her termination by UHS.  The Third Circuit has held in the ADA context that "temporal proximity between the protected activity

_____

[19] The Court notes that the record does not reflect that Murray sought FMLA leave.  <u>See</u> Murray Dep. 172.  Nevertheless, because the defendant has not explicitly moved for summary judgment on these grounds, the Court declines to consider the argument sua sponte.

and the termination [can be itself] sufficient to establish a causal link." Shellenberger, 318 F.3d at 183 (internal quotation marks and citation omitted).  However, the timing of the alleged retaliatory action must be "unusually suggestive of retaliatory motive before a causal link will be inferred." Id. at 189 n.9. Compare Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding that two days between the protected activity and the alleged retaliation supported an inference of causal connection) with Williams, 380 F.3d at 760 (finding that two months of elapsed time, by itself, did not raise an inference of causal connection).

Here, the timing of eleven days is closer to the Jalil end of the temporal spectrum.  Thus, the plaintiff's temporal evidence suffices under Third Circuit case law for the purposes of establishing causation in the plaintiff's prima facie case for retaliation.

E.   Defendant's Burden: Legitimate Non-Discriminatory Reason for Termination

As to both the ADA and FMLA claims, the defendant UHS has met its burden of showing that there was a legitimate, non-discriminatory reason for Murray's termination.  UHS provides ample evidence of Murray's narcotics errors and subsequent failure to report the errors.  In particular, UHS's narcotics distribution and accounting procedures at the hospital are

26

uncontested.  See Def.'s Stmt. ¶¶ 6-13; Pls.' Stmt. Resp. ¶¶ 6-13.  Murray also admitted that she made mistakes on the Pharmacy Record and Schedule II.  Murray Dep. 122-125.  UHS has provided testimony that Murray was terminated because of her errors, her failure to report the errors, and her inability to explain the errors, and not because of her mental health issues.  Mahoney Dep. 63-65; Plotkin Dep. 79-81.


    F.   Plaintiff's Burden: Pretext

UHS argues that even if the plaintiff has presented a prima facie case of discrimination and retaliation under the ADA and FMLA, she has not offered evidence raising a genuine factual dispute as to whether UHS's proffered non-discriminatory reason for terminating Nancy Murray was pretextual.  The Court agrees.

To defeat a motion for summary judgment where a defendant has offered a legitimate, non-discriminatory reason for an adverse employment action, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  These are two ways by

which the plaintiff can prove that the defendant's reasons was
pretextual.

    1.   First Pretext Test: Discrediting the Employer's
        Reason

To discredit the employer's articulated reasons, "the
plaintiff cannot simply show that the employer's decision was
wrong or mistaken." Id. at 765.  "Rather, the non-moving
plaintiff must demonstrate such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a
reasonable factfinder could rationally find them 'unworthy of
credence . . . .'" Id. (quoting Ezold v. Wolf, Block, Schorr &
Solis-Cohen, 983 F.2d 509, 531 (3d Cir.1992)).  The plaintiff
must show by a preponderance of the evidence "not merely that the
employer's proffered reason was wrong, but that it was so plainly
wrong that it cannot have been the employer's real reason."
Keller v. Orix Cred. Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir.
1997).

Although the plaintiff points out one inconsistency in
the record, she has not met her burden here.  UHS's proffered
reason for termination was not only the narcotics errors and the
failure to report the errors, but also Murray's inability to
explain her errors when confronted with them.  As the plaintiff
points out, however, Murray testified - and this Court must

accept as true - that she was never even given a chance to explain the errors.

Although this factual inconsistency does raise some questions as to whether the failure to explain was truly a reason for termination, it does not make termination for the narcotics errors themselves and for failure to report them implausible or so plainly wrong that they could not have been the real reasons for termination.[20]  See Fuentes, 32 F.3d at 762 (requiring the nonmoving party to cast sufficient doubt upon each of the legitimate reasons proffered by the defendant).

   2.   Second Pretext Test: An Invidious Discriminatory
        Reason Was More Likely Than Not a Motivating
        Factor

The plaintiff must "point to evidence with sufficient probative force for a factfinder" to make the conclusion that an invidious discriminatory reason was more likely than not a motivating factor for the termination.  Simpson v. Kay Jewelers, 142 F.3d 639, 644-45 (3d Cir. 1998) (internal quotations omitted).  One example of such evidence is more favorable treatment of other employees not exercising the same right.  See id.

_____

[20] The Court notes that the plaintiff conveniently ignores the fact that Theresa Mahoney, the HR director, also participated in the decision to terminate Murray's employment, along with Jack Plotkin.  The record reflects that Mahoney was unaware of Murray's mental health problems.

The plaintiff argues that other employees who also made narcotics errors were not similarly disciplined.  UHS argues that the other employees who erred are not comparable because Murray is the only one who did not report her errors.  The Court concurs with UHS.

The Naber case provides a useful comparison.  In that case, the court found that an employee who incorrectly recorded the date of an activity that she provided to a nursing home resident was not comparable to the plaintiff's error of falsifying a treatment record of a resident who was not in the nursing home.  Naber v. Dover Healthcare Assocs., Inc., 765 F. Supp. 2d at 638.  The employee's behavior after making the error distinguished the plaintiff from the alleged comparator.

Such is the case here.  For example, Jack Plotkin testified that one of the alleged comparators, Joe Wall, reported his narcotics recording error to his supervisor.  Plotkin Dep. 94.[21]  Similarly, Murray admitted that another alleged comparator, Jennifer O'Donnell, reported her error to management. Murray Dep. 79, 82-83.  And former charge nurse Linda Brem certified that nurses who had made multiple mistakes with narcotics filled out forms after each incident and reported the mistakes to management.  Pl.'s Opp., Ex. J (Cert. of Linda Brem). Although Murray testified that Beth Ann Watson made up an

---

[21] To Plotkin's knowledge, Wall was not disciplined. Plotkin Dep. 53-55.

incident report regarding a missing narcotic and did not notify management, there is no evidence in the record that management was aware of the narcotics error (and, hence, that management had the opportunity to discipline Beth Ann Watson for the error). Murray Dep. 84.

Murray is the only instance of a nurse who made not one, but two narcotics errors and failed to report those errors to her superiors.  Although Murray testified that she was unaware of her mistake regarding the 25 doses signed out of the Pharmacy Record, she admitted that she should have secured a wasting signature for the medications that she allegedly wasted.  The other alleged comparators proffered by Murray are not comparable.

Therefore, drawing all factual inferences in favor of the plaintiff, the Court grants summary judgment on all claims because the plaintiff has failed to raise a genuine issue of material fact as to whether UHS's proffered reasons for Murray's termination were pretextual.

An appropriate order follows separately.